M. F. WALKER et ux. v. W. T. WALKER et al.

Eastern Section. June 20, 1930.

John R. Todd, Jr., and B. B. Dade, both of Kingsport, for appellant.
Allen & Allen, of Elizabethton, for appellee.

SENTER, J. The complainants, M. F. Walker and wife, Loyette Walker, the father and step-mother respectively, of the defendant, W. T. Walker, filed this suit to recover under an alleged parol contract the amount alleged to be due them at the rate of $50 per month for the support, maintenance, education and rearing of the two minor daughters of the defendant, W. T. Walker, and also to attach a house and lots in the town of Elizabethton, on the allegations that the defendant was about to sell his equity in said property for the purpose of defeating and defrauding complainants in the collection of the debt sued upon. Subsequently, the original bill was amended so as to sue in the alternative on a quantum meruit basis.

By his answer the defendant, W. T. Walker, denied that he entered into a contract by which he stipulated to pay to complainants the stipulated sum of $50 per month, or any other stated amount; and denied that complainants were entitled to recover anything against him on account of the services rendered to his minor children.

Before the filing of the answer, the defendant W. T. Walker, filed a demurrer to the original bill on the grounds that it appeared from the allegations of the bill that the alleged contract was in parol and not reduced to writing, and was therefore violative of the statute of frauds and perjuries, and not enforceable against him; and because of lack of equity on the face of the bill, wherein the suit was predicated upon a void contract.

The demurrer was overruled, and the defendant, W. T. Walker, relied upon the grounds of the demurrer in his answer.

We deem it unnecessary to elaborate upon the pleadings. Under the pleadings and the facts it appears that the wife of defendant, W. T. Walker, died in 1914 or 1915, leaving an infant daughter and another daughter about two years of age. The father of the deceased wife of the defendant first took the infant child to his home to care for it, and the complainants took the older child into their home to care for it. Later the defendant, who was about to leave for Oregon for an indefinite time, arranged with his father and stepmother, the complainants, to take both the children, and at the same time arranged for the purchase of a small residence in the town of Elizabethton, with

the agreement that his father and stepmother would leave the small farm on which they then lived and that defendant, W. T. Walker, would furnish them a house in which to live and take care of and rear the two children. There is a decided conflict in the evidence on the question as to whether the defendant, W. T. Walker, agreed to pay a stipulated sum per month to the complainants for the support, maintenance and schooling of the children in addition to the furnishing of the home. However, the defendant, W. T. Walker, admitted that he expected to pay to the complainants reasonable compensation, and to make such contribution as he was financially able to make in the support of his father and stepmother, and the two minor children. After this arrangement was made, the defendant went to Oregon, where he obtained employment and resided there for some time. Soon after his return he located in Kingsport and married again. His second wife was a widow with four children, and there was born to that marriage two other children. Some year or more after this second marriage the defendant proposed to take his two children into his family at Kingsport. There is some conflict in the evidence with reference to this question, but we think that the defendant, W. T. Walker, did make such a proposal to the complainants, but the two children had become very much attached to the grandparents and preferred to continue to live in the home with them. However, some time later, a few months, complainant, M. F. Walker, wrote his son, the defendant, requesting him to come and take the children. In response to this letter the defendant, W. T. Walker, went to Elizabethton for the purpose of getting the children and taking them to his home in Kingsport. Upon his arrival the children pleaded with their father to permit them to continue to live with their grandparents at Elizabethton, and he agreed to do so and the children continued to live with their grandparents. They had grown to be young ladies of about fifteen and seventeen years of age, respectively, and almost from infancy had lived with the complainants who had reared them and attended them in sickness and had sent them to school regularly, and the oldest girl had graduated from the junior high school in Elizabethton. The father of the defendant was a poor man, and did not own any property of his own, and had lived in the small residence owned by the defendant and furnished by him to the complainants. He supported himself and the two children by his daily labor at such work as he could procure. The stepmother of the defendant also worked and a part of the time she earned some money that she contributed to the support of the family. In addition to furnishing the home, the defendant sent to his father and stepmother small sums of money from time to time, and also furnished some clothing and wearing apparel to the two daughters. The amount of money which the defendant sent to his father and stepmother is not definitely shown

by the record. According to the evidence of the defendant, W. T. Walker, during the entire period he sent around $400 or $500, in money, and some dresses and shoes and hats to his daughters. According to the evidence of the complainants he sent very little money during the entire period, although the complainants and the two daughters wrote many times to the father requesting that he send them money, and explaining their needs. According to their evidence, during the entire period he furnished them with thirteen cheap dresses each, the most of them gingham, and only six made up, and some eight or ten pairs of shoes or slippers each, and two hats and one cloak each. The value of these articles is not shown by definite evidence.

Shortly before the bill in this cause was filed, the defendant, W. T. Walker, negotiated a sale of the Elizabethton house and lots for approximately $4700, and that his equity in the property, or the amount which he would receive after certain encumbrance debts were paid, was about $2700. The defendant, Walker, admits that he was to furnish a home for the complainants for their lifetime, or while the children were with the complainants, and he claims that he offered to provide a home for them in Kingsport, by having them live in and occupy a part of the house in which he was living at Kingsport, and that complainants refused to accept that proposition. The complainants admit that the defendant did make such an offer, and that they declined to move to Kingsport and live in the same house with the defendant, W. T. Walker, but would go to Kingsport if the defendant would provide a separate house for them to live in. The complainants explained that they did not want to live in the house with any other family, and did not think it would prove pleasant or agreeable to either family.

The above is a summary of the material facts as disclosed by the evidence.

At the hearing of the cause, the Chancellor held that the complainants were entitled to recover on a quantum meruit basis, and that the action was not barred by the statute of limitations, and ordered a reference to the Clerk and Master to report on the following items:

"1. For what period the complainants have maintained and cared for the children, Emma and Mary Walker?

"2. What is a fair and just compensation per month, and for the entire period during which the complainants have kept the said children?

"3. What is the value of the house furnished complainants and what amount of money, clothing and other things for the upkeep of said children, have been furnished by the defendant, W. T. Walker?

134

"4. The Clerk and Master will report, what balance, if any, is due and owing the complainants by the defendant after allowing credits as above against the charges as above provided?"

In pursuance of the above reference the Master made his report, and by which he reported, first, that complainants have cared for Emma Ruth Walker for a period of fourteen years, and Mary Alice Walker for a period of thirteen years, that Ruth is now sixteen years of age; that for the first four years complainant should receive at the rate of $9 per month, a total of $432, and the remaining ten years $18 per month, or a total of $2160, for Ruth. And for Mary, that complainants have cared for her thirteen years and that she is now fourteen years of age. For the first five years, or until she was six years of age at the rate of $9 per month, a total of $540. The remaining eight years at the rate of $18 per month, or a total of $1728. He further reported that the complainants had expended in wiring the house, $28, for spouting, $15, for repairing roof, $20, totalling $63, and that M. F. Walker had paid taxes on said property to the amount of $60, making the aggregate total $4983.20. The Master further reported as credits against the above amount the value of the house rent on the house furnished from the years 1913 to 1925, at $10 per month; and from 1925 to 1927 at $20 per month; and amount of money, clothing, etc., furnished by the defendant from time to time, $300, making aggregate credits of $2220, leaving a total balance to complainants of $2763.20.

The complainants and the defendant both filed exceptions to the Master's report. The Chancellor, in acting upon the exceptions by the respective parties, modified the report both on the question of the value of the services rendered by the complainants, and also by disallowing the item of the repairs to the building, and held that under all the facts and circumstances, and considering the fact that these two girls aided in the housework, that $5 per month for the years for which the Master had allowed $9 would be sufficient compensation and that $12.50 per month would be sufficient for the remaining years, and after deducting the further item of the repairs, etc., to the house, and after allowing all the items of credit to the defendant reported by the Master, it left a net balance in favor of complainants of $1500, and for which amount he decreed a judgment in favor of the complainants and against the defendant and sureties on a refunding bond for said sum of $1500. The refunding bond referred to was given under an interlocutory decree of the court in which the Chancellor discharged the attachment and permitted the property to be sold and the value of the equity amounting to about $2700 paid into court pending a final determination of the suit, and which fund the defendant was permitted to withdraw upon the execution of bond to cover same.

From the above decree both parties have appealed to this court. The appeal by the complainants is a special appeal from so much of the decree as limits the recovery, and the appeal of defendant, W. T. Walker, is a general appeal from the whole decree. We will first consider the assignments of error by the defendant.

The first assignment is to the action of the court in overruling the demurrer, and allowing the complainants to recover on a quantum meruit basis. Under the assignment it is contended that the suit is predicated upon an alleged oral contract, and that the contract did not contemplate a performance within twelve months, and is therefore within the statute of frauds.

Several Tennessee cases are relied upon by defendant, in support of this contention. (Deaton v. R. R., 12 Heisk., 650; 6 Lea, 213; 7 Lea, 399; 145 Tenn., 338.)

The defendant in his brief states that this case is controlled by the Deaton v. R. R. case, wherein it is stated in the second head note:

"Statute of Frauds. Performance within a year. The jury found a verbal contract between the company and the widow of a person killed by one of its trains, whereby she agreed not to sue for damages, and the company thereupon agreed to support her and her three children (all then minors) during her life, and in the event of her death before the majority of the youngest child, to support the children until then. Held, that this contract was within the statute of frauds, Sec. 1758, Subsec. 5, as an agreement 'not to be performed within the space of one year from the making thereof.'"

In the body of the opinion in that case it is said:

"It is the settled construction of this provision of the statute, that if the executory promise be capable of entire performance within one year, it is not within this clause.

"The decision of this question does not seem to depend entirely upon the understanding or intention of the parties. They may contemplate as probable a much longer continuance of the contract, or a suspension of it and a revival after a longer period; it may in itself be liable to such continuance and revival; and it may in this way be protected so far as that it is not in fact performed within a year; but if when made it was in reality capable of a full and bona-fide performance within the year, without the intervention of extraordinary circumstances, then it is to be considered as not within the statute."

The court held in that case that the alleged parol contract upon which the suit was based was within the statute of frauds and perjuries, on the theory that if it had been limited to the agreement to support the widow during her life, the promise could be performed

if she was supported until her death, that occurring within a year. The court saying:

"Could this contract be performed within one year? As to the widow it could, as if her support during life was the object, the promise could be performed if she was supported until her death, that occurring within a year. When the promise is to continue to do something until the contingency occur, as, for instance, to pay during the promisee's life, or to support a child who is eleven years old until she is eighteen, in these cases the promise is not affected by the statute, because the party whose life is involved may die within a year."

After announcing the above proposition the court proceeds to apply the general rule to the facts of that particular case and states:

"As to the children, there were three of them (all minors), the youngest being —— years of age.

"The promise was to support and maintain them at all events until the youngest arrived at age.

"It was not to support and maintain the youngest child only until it should arrive at age, but to support the widow until that time if she should live to that period, and if she should die before that period, the support for the children was to continue until the youngest should come of age. Hence, if the mother and youngest child should both die within a year, the contract would continue in force until the period when the youngest child would have arrived at age if it had lived.

"The contract, therefore, could not be performed within the year, except upon the death of the widow and all three of the children within that period."

The court in that case held that that would be so unusual a contingency to happen in one year, it was contrary to the manifest intent and understanding of the parties, and that the mere fact that it was possible that the thing agreed to be done within the year, will not prevent the statute from applying. Said the court: "Physical possibility is not what is meant when it is said that if the verbal contract may be performed within the year is binding." The court further saying: "It is not enough that the thing stipulated may be accomplished in less time, but such an accomplishment must be an execution of the contract according to the understanding of the parties."

It will thus be seen that in that case the court recognized with approval the general rule of construction of the provisions of the statute, but held that under the facts of the alleged parole contract in that case and the unusual contingencies attaching thereto, that it did not come within the settled rule of construction to the effect "that if the executory promise be capable of entire performance within one year, it is not within this clause."

It may also be said that the Deaton case was undertaking to set up a very unusual parole contract, and one by the very nature of the conditions could not have been reasonably and in good faith in contemplation of the parties susceptible to a performance in one year. By that alleged parole contract the railroad company had agreed with the widow of one of its employees that if she would not sue for the death of her husband, that the railroad company would continue to pay to her the salary that it had been paying to him during her lifetime, and until the youngest of three minor children should reach the age of twenty-one years.

In the present case we have the father of an infant daughter, a few weeks old, and another daughter only two years of age surviving the death of their mother. He was not so situated as to take care of and rear these young children. In this situation his father and stepmother agreed to take the children and to care for them and to rear them, on the agreement that defendant would furnish them a home in Elizabethton, and with the understanding that he would expect to pay complainants for this service. He denies that he agreed to pay the alleged stipulated sum of $50 per month, and we think the Chancellor correctly held that the evidence preponderated against the claim of his stepmother that he would pay a stipulated sum. But we think it clear that it was in the contemplation of all the parties that the father of these children would make reasonable and proper contribution and payment to his father and stepmother in the necessary and proper support, maintenance and schooling of his children in addition to furnishing them a home in which to live in Elizabethton. There was certainly an implied contract or agreement upon the part of the defendant that he would discharge his duty. and obligation as the father of these children. This agreement was clearly susceptible of performance within one year. The rule is thus stated in 27 C. J., Sec. 106, page 184:

"A parol agreement to board, or to support or to contribute a certain percentage of the income from property yearly to the support of a person during his life or other indefinite period is regarded as having been made by the parties thereto in contemplation of the possible contingency of the person's death within the year, and, being capable of complete performance within a year, it is not within the statute. The same is so of an oral contract to support a person until he reach his majority or attains a certain age, the contingency being implied that he may die within a year. The same contingency of death being implied, an oral agreement to pay for the maintenance or education of the child is not within the statute . . ."

We are of the opinion that the implied agreement upon which the learned Chancellor based his decree is not within the statute, and is

not, therefore, void. The assignments of error based upon this question are accordingly overruled.

This also disposes of the second assignment, which is to the effect that the Chancellor erred in overruling defendant's demurrer, because the bill did not show equity on its face. Under this assignment it also being contended that the parole agreement sued upon was within the statute of frauds.

By the third assignment it is said that the Chancellor erred in decreeing a recovery for the service of maintaining and rearing the children. In support of this assignment it is insisted that under the facts of the case it was not in contemplation of the complainants and the defendant that any charge for this service would be made; that because of the relationship which complainants sustained to these children (grandparents), that they did not expect to make any charge for caring for and supporting these children, and that the defendant did not expect that a charge would be made for this service. Numerous authorities are cited in support of the contention that the person rendering the service, and does not at the time the service is rendered intend to make a charge therefor, cannot afterwards recover for the services rendered. The facts of this case do not bring it within that rule. In this case the father of defendant was a poor man and dependent upon his own labor, at his advanced age, for the support for himself and wife. He had no property. The defendant, after the death of his wife, had no one dependent upon him but his two children of tender years. He was much more capable of earning than was his aged father. Under the undisputed facts of this record he earned as high as $6.25 a day while he was in Oregon, and his board was only $55 per month. Upon his return to Tennessee he was regularly employed at fair wages, and after his second marriage he and his wife conducted a boarding and rooming house and had several boarders and roomers, and he was certainly earning a sufficient amount to support his children. Under the finding of the facts by the Clerk and Master, which was concurred in on that question by the Chancellor, the entire amount of cash and wearing apparel contributed by the defendant in aid of the support of these two children, was $300, and we think this was a full allowance to the defendant on that item. We are therefore of the opinion that under the facts of this record it cannot be said that the aged parents of the defendant, without any means of their own, and with but limited earning capacity by the father of defendant, about $9 per week, that these grandparents were rendering this service without expecting to receive fair aid from this son and father of the children. The defendant admits that he expected to compensate his father and stepmother for the service they were rendering to his children insofar as he was able.

It is also insisted that the father sought to take these children back to his home after his remarriage, and that the complainants refused to permit him to do so because of their attachment for the children. We do not think that this contention is supported by the evidence. It is true that the defendant at one time proposed to take the children, and that the grandparents made some objections on account of the children. However, a short time after this proposal was made complainant, M. F. Walker, wrote the defendant suggesting that he take the children to his home at Kingsport, and in response to this letter the defendant went to Elizabethton to get the children. Their wearing apparel had already been packed by the grandparents upon the arrival of the defendant. It appears that when the children were notified that they were to go and live with their father and stepmother they pleaded very earnestly with their father to let them remain with their grandparents and not to take them away, and it was for this reason that the father permitted them to remain with the grandparents. We do not think that this proposal of the father to take the children would operate to relieve him of the duty, both moral and legal, to support his children.

By the fourth assignment it is said that it was error to allow a recovery because the complainants seek to recover for the benefit of the children and not themselves, the children not being parties to the suit, nor is their guardian. This suit does not purport to be a suit for the benefit of the children, and the original bill and all the pleadings shows it to be a suit by the complainants to recover a judgment for the amount alleged to be due them for services rendered in the support, maintenance, rearing and educating these children. It would appear that this assignment is based upon a statement made by complainant, M. F. Walker, in his evidence, wherein he explains that he brought this suit for the protection of the children, and explained his meaning. This assignment is accordingly overruled.

By the fifth assignment of error it is insisted that because of laches the complainants are estopped from maintaining this suit. This assignment proceeds upon the theory that for more than ten years while these children were in the care and custody of the complainants that no demand was made upon the defendant for anything more than he was already doing for the children. Authorities are cited by defendant in support of this contention. The facts of this case as disclosed by a preponderance of the evidence shows that not only the complainant, M. F. Walker, made many requests upon the defendant to send him money for the support of the children, but the oldest girl, about seventeen years of age, testified that she wrote her father several times requesting that he send them money with which to buy necessary clothing, etc., and that he did not reply to her letters or comply with the request. Aside from this, the defendant certainly

knew the limited ability of his aged father and stepmother to support these children, feed them, clothe them and school them without substantial aid from him. It was his clear duty to have anticipated their needs and pay for this service without being repeatedly called upon to do so. This assignment is overruled.

The sixth assignment invokes the statute of limitations of six years as a bar. This assignment cannot be sustained. The general rule on this subject, applicable to cases of this kind, is stated in 37 C. J., 853, section 213, wherein it is said:

"Contracts to support and maintain a person have been held to be continuing contracts, so that the statute does not begin to run against any part of the claim of the person furnishing the support until the contract expires by its own terms or is otherwise brought to an end, although the statute does then begin to run."

In the case of Whitehead v. Boyers, 7 Yerg., 545, it is held that where the transaction is a continuing one, and there were credits from time to time, but no accounting, the statute does not begin to run until there has been an accounting. Section 4475, Shannon's Code, provides:

"Where there are mutual accounts between persons who are not merchants, the time is computed from the true date of the last item, unless the account is liquidated and a balance struck."

Proceeding upon the theory that there was an implied agreement upon the part of the defendant to properly compensate the complainants for the service they were to render in the support, maintenance, and caring for these children, the learned Chancellor, in effect, directed the Clerk and Master to take and state an account between the parties. He held that the complainant was entitled to recover reasonable compensation for the time that he had cared for the children, and that the defendant was entitled to be credited with all amounts which he had paid to the complainant or furnished to the children, including the rental value of the home that he furnished them. The defendant had made contributions, small amounts of money, clothing, etc., from time to time, during the whole time these children were cared for by the complainants, and no balance was ever taken or made, hence the account was a continuing account, and we think comes not only within the statute above quoted on the subject, but under the general rule on the subject.

It results that all assignments of error by the defendant are overruled.

The complainants, by their special appeal, assign as error the action of the Chancellor in reducing the amount per month as fixed by the Master in his report from $9 to $5 per month each until the children

reached the age of six years, and in reducing from $18 per month to $12.50 per month, for the remainder of the period.

The complainants have cited extensively from the record the evidence on the subject of the value of the services. We have carefully examined all the evidence on this subject, and considering all the facts and circumstances as shown by the record; the relationship and the interest which the complainants manifestly had in these grandchildren, and the further fact that for the past several years these children have been able to assist in the usual household duties, and were not boarders in the sense that that term is usually applied, we are of the opinion that the Chancellor very properly reduced the amount as found by the Master. It is true that the amount allowed by the Chancellor is very small, $5 per month each until they reached the ages of six years, and $12.50 per month each, thereafter, but the Chancellor based his action upon the facts and circumstances above set forth, and which we think was proper.

It results that the assignments of error by complainant are also overruled.

The decree of the Chancellor is affirmed. The decree was for a money judgment against the defendant and sureties on the refunding bond, and judgment will be rendered here in favor of complainants and against the defendant and sureties on the refunding bond, as adjudged in the court below, and the sureties on the appeal bond of the defendant, with interest thereon from the date of the decree, including the cost of this appeal.

Owen and Heiskell, JJ., concur.